IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SHIRLEY M. GREEN, et al.            :

                                      :

     v.                       :   Civil Action No. DKC 12-1040

                                        :

WELLS FARGO BANK, N.A.            :

                                        :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this consumer lending action is a motion to dismiss filed by Defendant Wells Fargo Bank, N.A.  (ECF No. 25).  The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary.  For the reasons that follow, Defendant's motion will be granted.

**I.   Background**

**A.   Factual Background**

The following facts are drawn from the amended complaint and exhibits attached thereto.  (ECF No. 24).  On May 31, 2006, Plaintiffs Shirley M. Green, Ralph E. Green, and Antoinette Green took out a mortgage of just under $1 million from Southern Trust Mortgage, LLC, to finance their purchase of a home in Upper Marlboro, Maryland.  The servicing rights to the loan were later assigned to Defendant Wells Fargo Bank, N.A.

In or around October 2010, the Greens experienced financial difficulties and fell behind on their mortgage payments. In late March or early April 2011, they contacted Wells Fargo to inquire about a loan modification. In response, Defendant sent a letter dated April 8, 2011, which opened with the statement, "[a]t Wells Fargo Home Mortgage, our goal is to ensure that you have every opportunity to retain your home." (ECF No. 24-4, at 2).[1] Defendant advised the Greens, "[i]n order to process your request for Loan Modification, the following information is needed . . . for each specified borrower[:] . . . Proof of Income (paystub, SSI, child support)." (*Id.*). The letter further stated:

> If ALL of this information or a request for an extension is not received within ten (10) days from the date of this letter, we will consider this request cancelled. Please note any collection and foreclosure action will continue uninterrupted until approval. Therefore, a timely response is essential.

(*Id.* (emphasis in original)).

The Greens failed to respond promptly to Defendant's request for information, and, on May 16, 2011, a foreclosure action was commenced against them in the Circuit Court for Prince George's County, Maryland. (ECF No. 24-10; *see also* ECF

---

[1] References to page numbers in the exhibits attached to the amended complaint are to those assigned by the court's internal electronic case filing system.

No. 23-2).[2]   Approximately one week later, Ralph and Shirley Green submitted a number of documents to Wells Fargo, including paystubs, a lease showing their receipt of monthly rent in connection with an unspecified property, various tax documents, and documents related to a second mortgage on their home.  This submission was accompanied by a cover letter in which the Greens provided detail of the circumstances leading to their default and asked Wells Fargo "to consider working with [them] to modify [their] loan before it goes into foreclosure."  (ECF No. 24-3, at 1 (emphasis removed)).

In mid-June 2011, the Greens received a letter from a Wells Fargo "Home Preservation Specialist," Mike Leiferman, who introduced himself as "part of the special team that's dedicated to helping [them] with [their] request for mortgage payment assistance."  (ECF No. 24-5, at 2; *see also* ECF No. 24-7, at 3).  Mr. Leiferman advised that he would be the Greens' "primary contact, to help [them] every step of the way," and would work

---

[2] Plaintiffs attach to the amended complaint the affidavit of the substitute trustee, which was filed along with a copy of the underlying deed of trust in the foreclosure action.  (ECF No. 24-10).  Defendant attaches to its initial motion to dismiss, which was subsequently renewed, a docket report from the foreclosure proceeding.  (ECF No. 23-2).  A federal district court may take judicial notice of documents from state court proceedings and other matters of public record in conjunction with a Rule 12(b)(6) motion without converting it to a motion for summary judgment.  *See Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Papasan v. Allain*, 478 U.S. 265, 268 n. 1 (1986)).

"closely with [a] team of specialists to determine what options might be right for [them]." (*Id.*). The letter reminded the Greens that Wells Fargo had recently asked them to "forward [] certain documents" necessary for a determination as to their "eligibility for payment assistance," and requested that they promptly submit this information if they had not done so already. (*Id.*). Mr. Leiferman asked Plaintiffs to "keep in mind that the sooner [they responded], the sooner [Wells Fargo could] determine [] eligibility for payment assistance," and stated that he would be "in touch . . . to discuss what happens next" after the requested information had been "receive[d] and review[ed]." (*Id.*).

On or about June 23, the Greens had a "conversation" with Mr. Leiferman during which he apparently clarified the documents that were necessary to process the loan modification request. (ECF No. 24-6, at 2). On June 29, "[a]s requested" during that conversation, Plaintiffs submitted "pay stubs for April and May [2011] for Ralph and Shirley Green[;] personal bank statement[s] for March, April, [and] May[;] [IRS] Form 4506[T;] [and a] May bank statement for Bank of America." (*Id.*).

On November 4, 2011, the Greens received a letter from Mr. Leiferman "responding to [their] request for mortgage assistance and the options that may be available to help [them]." (ECF No. 24-7, at 2). The letter advised that Wells Fargo had "carefully

4

reviewed the information" provided and "explored a number of mortgage assistance options," but concluded that the Greens did "not meet the requirements of the program" because Wells Fargo had "not been able to reach [them] to discuss [their] situation, and without input from [them], [it was] not able to review [them] for a loan modification." (*Id.*). Defendant stated that it would "continue to work" with the Greens "to help [them] avoid a foreclosure sale," but cautioned that "if [their] mortgage ha[d] been referred to foreclosure, that process moves forward at the same time." (*Id.* at 3). Plaintiffs responded by letter dated December 1, stating, "[a]fter months of patiently waiting for a loan modification, we are devastated over the decision [not to] offer us a reasonable mortgage assistance solution." (ECF No. 24-8, at 2). "Contrary to the letter dated 11/4/11," they asserted, "we have provided every document requested over and over again . . . [and] initiated calls on numerous occasions for updates and statuses of our loan," characterizing the prior statement that they could not be reached as "absurd." (*Id.*). Plaintiffs further stated, "[t]his process has caused extreme stress which has affected our health," recalling that they were "told by Michael Leiferman, the Home Preservation Specialist[,] on numerous occasions, not to worry[,] that things would [work out,] and that everything was fine[,] that [the] loan was in underwriting." (*Id.*).

5

According to the Greens, Mr. Leiferman also told them that "all documents that were needed had been received." (*Id.*).

By letter dated December 14, 2011, Wells Fargo requested that Plaintiffs "[c]all . . . immediately so [it could] respond to [their] request for mortgage payment assistance." (ECF No. 24-9, at 2).  The letter thanked Plaintiffs for "sending . . . documentation supporting [their] request," advising that Wells Fargo was "here to help," but that it was "critical" that they make contact "immediately to determine what options may be available." (*Id.*).  Because Plaintiffs were "in the foreclosure process," Defendant cautioned that they had "limited time to receive assistance before a foreclosure sale [was] scheduled." (*Id.*).  Wells Fargo asserted that it would continue to "work with" the Greens "to help prevent foreclosure," but that if it did not "receive all required documents before the scheduled foreclosure sale, [it] may not be able to stop the sale." (*Id.*).  Defendant asked Plaintiffs to "gather the following information and have it ready when [they] call[:] . . . Monthly gross income (before taxes) for each borrower[,] [a]ny additional household income[,] [c]urrent monthly expenses (have a list of all expenses, including any taxes and insurance for your home paid separately from your mortgage payment)[,] and [the] [r]eason for [their] financial hardship." (*Id.*).

## B.   Procedural History

Ralph and Shirley Green commenced this action in the Circuit Court for Prince George's County on February 1, 2012, alleging violations of the Maryland Consumer Protection Act, common law fraud, promissory estoppel, negligence, and negligent misrepresentation, and seeking compensatory damages of $1 million, punitive damages of $3 million, specific performance of the alleged promise "to process their documentation and make a decision on their eligibility for payment assistance," plus interest, attorneys' fees, and costs. (ECF No. 2 ¶ 51(a)). Defendant timely removed to this court on April 4, 2012, and, shortly thereafter, filed a motion to dismiss for failure to state a claim and failure to join as a necessary party Antoinette Green, a co-borrower under the deed of trust. (ECF No. 23). On May 7, the Greens amended their complaint, adding Antoinette Green as a plaintiff. (ECF No. 24).[3]

On May 25, Defendant renewed its motion to dismiss, adopting the arguments advanced in support of its prior motion and briefly addressing the new allegation raised by Plaintiffs in their amended pleading. (ECF No. 25). Plaintiffs filed

---

[3] In addition to adding Antoinette Green as a plaintiff, the amended complaint alleged another misrepresentation by Defendant – namely, that "its 'Final Loss Mitigation Affidavit' filed in the foreclosure in the Circuit Court for Prince George's County [falsely] represents that the Greens failed to submit the second page of their 2009 tax returns." (ECF No. 24-1 ¶ 31.1).

opposition papers on June 11 (ECF No. 27), and Defendant replied on June 28 (ECF No. 28).[4]

## II.  Standard of Review

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  A plaintiff's complaint need only satisfy the standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed.R.Civ.P. 8(a)(2).  "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n. 3 (2007).  That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

At this stage, all well-pleaded allegations in a complaint must be considered as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and all factual allegations must be construed in the light most favorable to the plaintiff, *see Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134

---

[4] Defendant later filed two sets of papers advising of supplemental authority (ECF Nos. 29, 31) and Plaintiff filed a response to the first (ECF No. 30).

(4th Cir. 1993)).   In evaluating the complaint, unsupported legal allegations need not be accepted.   *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989).   Legal conclusions couched as factual allegations are insufficient, *Iqbal*, 556 U.S. at 678, as are conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).   "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] . . . that the pleader is entitled to relief.'"   *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)).   Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."   *Id.*

Plaintiffs' claims alleging fraud and violation of the Maryland Consumer Protection Act are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b).   *See Harrison*, 176 F.3d at 783-84; *Dwoskin v. Bank of America, N.A.*, 850 F.Supp.2d 557, 569 (D.Md. 2012).   Rule 9(b) provides that, "in alleging a fraud or mistake, a party must state with particularity the circumstances constituting the fraud or mistake.   Malice, intent, knowledge, and other conditions of a

person's mind may be alleged generally." Such allegations typically "include the 'time, place and contents of the false representation, as well as the identity of the person making the misrepresentation and what [was] obtained thereby.'" *Superior Bank, F.S.B. v. Tandem Nat'l Mortg., Inc.*, 197 F.Supp.2d 298, 313-14 (D.Md. 2000) (quoting *Windsor Associates, Inc. v. Greenfeld*, 564 F.Supp. 273, 280 (D.Md. 1983)). In cases involving concealment or omissions of material facts, however, meeting Rule 9(b)'s particularity requirement will likely take a different form. *See Shaw v. Brown & Williamson Tobacco Corp.*, 973 F.Supp. 539, 552 (D.Md. 1997) (recognizing that an omission likely "cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation" (internal quotations omitted)). The purposes of Rule 9(b) are to provide the defendant with sufficient notice of the basis for the plaintiff's claim; to protect the defendant against frivolous suits; to eliminate fraud actions where all of the facts are learned only after discovery; and to safeguard the defendant's reputation. *See Harrison*, 176 F.3d at 784.

## III. Analysis

The thrust of the amended complaint is that Wells Fargo, through a series of communications, intentionally led Plaintiffs to believe that their loan modification request was being

10

considered when, in fact, it never intended to process their application or to modify their loan. According to Plaintiffs, the purpose of this scheme was to lead them "into a false state of comfort . . . and thereby reduce the chance that [they] would assert foreclosure defenses – because Wells Fargo knew foreclosure objections would frustrate its pursuit of revenue through collection of late fees and penalties at a foreclosure sale." (ECF No. 24 ¶ 29.9). The complaint recites that "[t]he Greens relied on the promise [that Defendant would process their modification request], to their detriment, by trusting Wells Fargo and taking time out of their lives to comply with [Defendant's] request[s] for documentation." (*Id*. at ¶ 3). "As a direct and proximate result of Wells Fargo's conduct, the Greens['] credit scores were lowered" and they "suffered from severe mental anguish, which manifested physically through vomiting, headaches, sleep loss, and other physical symptoms." (*Id*. at ¶¶ 30, 31).

Plaintiffs assert violations of the Maryland Consumer Protection Act, common law fraud, and negligent misrepresentation based on Defendant's "promise to engage in loss mitigation analysis," which they contend constitutes "a false representation . . . in the collection of a consumer debt." (*Id*. at ¶¶ 2, 5). In support of their promissory estoppel claim, Plaintiffs assert that "[b]y making a promise on

11

which the Greens relied to their detriment, equity requires specific enforcement" – namely, that Wells Fargo "process their documentation and make a decision on their eligibility for payment assistance pursuant to [its] internal procedures and guidelines, and, if eligible, to provide payment assistance in accordance with said procedures and guidelines[.]" (*Id*. at ¶¶ 6, 51(a)). They further allege that "by losing or overlooking documentation, repeatedly, in connection with a loan modification application, Wells Fargo was negligent." (*Id*. at ¶ 7).

Defendant argues that the amended complaint is subject to dismissal for two reasons. First, it contends that the negligence and negligent misrepresentation claims must fail because it did not owe the Greens a duty of care. Second, Defendant argues that Plaintiffs "cannot point to a false representation of a present or past material fact, which they justifiably relied upon, to cause them damages." (ECF No. 23-1, at 16).

### A.   Negligence and Negligent Misrepresentation

As Defendant observes, Plaintiffs' counsel has recently filed negligence and negligent misrepresentation claims in this district in a number of cases very similar to this one, and courts considering such claims have generally found them subject to dismissal because the defendants did not owe a tort duty to

the plaintiffs.   It contends that Plaintiffs' negligence and negligent misrepresentation claims must be dismissed for the same reason.

As Judge Russell explained in *Spaulding v. Wells Fargo Bank, N.A.*, Civ. No. GLR-11-2733, 2012 WL 3025116, at *4-5 (D.Md. July 23, 2012):

> Counts II (negligence) and IV (negligent misrepresentation) of Plaintiffs' Complaint must fail because Wells Fargo did not owe Plaintiffs a tort duty. In Maryland, causes of action based on negligence or negligent misrepresentation require the plaintiff to prove a duty owed to them. *Jacques v. First Nat'l Bank of Maryland*, 307 Md. 527, 515 A.2d 756, 758 (Md. 1986). Plaintiffs cannot, therefore, allege actionable claims of negligence and negligent misrepresentation without first demonstrating Wells Fargo owed them a duty in tort. *Id.* ("Absent a duty of care there can be no liability in negligence.") (citations omitted); *Parker v. Columbia Bank*, 91 Md.App. 346, 604 A.2d 521, 531 (Md.Ct.Spec.App. 1992) ("In order to state a cause of action as to . . . negligent misrepresentation, [and] negligence . . . the [plaintiffs] must demonstrate a duty owed to them by [the defendants].") (citations omitted).
>
> It is well established in Maryland that the relationship between the bank and borrower is contractual, not fiduciary, in nature. *Yousef v. Trustbank Sav., F.S.B.*, 81 Md.App. 527, 568 A.2d 1134, 1138 (Md.Ct.Spec.App. 1990). Moreover, "[t]he mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort." *Jacques*, 515 A.2d

> at 759. In cases involving economic loss,
> the imposition of tort liability requires
> "an intimate nexus between the parties" that
> is satisfied by "contractual privity or its
> equivalent." *Id*. at 759-60. Absent special
> circumstances, the court is reluctant to
> "transform an ordinary contractual
> relationship between a bank and its customer
> into a fiduciary relationship or to impose
> any duties on the bank not found in the loan
> agreement." *Parker*, 604 A.2d at 532
> (citations omitted).

*See also Goss v. Bank of America, N.A.*, --- F.Supp.2d ----, 2013 WL 105326, at *5 (D.Md. Jan. 8, 2013); *Farasat v. Wells Fargo Bank, N.A.*, --- F.Supp.2d ----, 2012 WL 6649592, at *7-8 (D.Md. Dec. 19, 2012); *Legore v. One West Bank, FSB*, --- F.Supp.2d ----, 2012 WL 4903087, at *4-5 (D.Md. Oct. 15, 2012); *Matthews v. Wells Fargo Bank, N.A.*, Civ. No. MJG-12-1024, 2012 WL 3903453, at *1 (D.Md. Sept. 6, 2012) ("adopt[ing], *mutatis mutandis*, the decision of Judge Russell in *Spaulding* as its decision and [] follow[ing] its rationale"); *but see Neal v. Residential Credit Solutions, Inc.*, Civ. No. JKB-11-3707, 2013 WL 428675, at *5-6 (D.Md. Feb. 1, 2013) (denying motion for summary judgment as to negligent misrepresentation claim upon finding that a "duty of care" to "provide truthful information to Plaintiffs to maintain their mortgage in good standing" arose from the "existing

contractual relationship . . . based upon [the] original mortgage").[5]

In opposing Defendant's motion to dismiss, Plaintiffs argue that a sufficient nexus is presented here by virtue of their existing contractual relationship with Wells Fargo (*i.e.*, the underlying mortgage) and their particular vulnerability as unsophisticated borrowers in financial distress. They rely primarily on *Jacques*, 307 Md. at 542, where the Court of Appeals of Maryland found that a bank "owed a tort duty in connection with a loan application because the plaintiffs risked losing

---

[5] Unlike the instant case, these cases all involved modification requests under the Home Affordable Modification Program ("HAMP"). In response to Defendant's filing of a notice of supplemental authority advising of the *Spaulding* decision (ECF No. 29), Plaintiffs argued that because "[t]he thrust of Judge Russell's ruling was the absence of a private right of action under [HAMP,] . . . [the] opinion is inapposite." (ECF No. 30 ¶ 2). Plaintiffs are mistaken. In fact, Judge Russell noted – as courts in this district repeatedly have – that although there is no private right of action under HAMP, "the enforcement of a standing [Trial Period Plan ("TPP")] Agreement may give rise to a private right of action because the agreement establishes privity of contract between the parties," and then "address[ed] each of [the] [p]laintiffs' counts." *Spaulding*, 2012 WL 3025116, at *3. Notably, the case principally relied upon by Plaintiffs in opposing Defendant's motion to dismiss, *Allen v. CitiMortgage, Inc.*, Civ. No. CCB-10-2740, 2011 WL 3425665 (D.Md. Aug. 4, 2011), is also a HAMP case. In their opposition papers, Plaintiffs argue that this is of no real consequence because Judge Blake "analyzed the plaintiffs' claims, not as attempts to assert a private right of action under HAMP, but rather [as] allegations of well recognized, viable tort, contract and statutory claims[.]" (ECF No. 27-1, at 1 n. 1). There is no discernible basis for distinguishing the reasoning of *Allen* from that of *Spaulding*.

their $10,000 deposit." (ECF No. 27-1, at 6). Plaintiffs contend that they "risked losing not simply $10,000, but their entire home"; thus, "[t]he argument for the imposition of a tort duty . . . is clearly stronger than the argument that did lead to the imposition of a tort duty in *Jacques*." (*Id*.).

Plaintiffs' reading of *Jacques* is short-sighted. The plaintiffs in that case entered into a residential sales contract to purchase a home that was contingent upon them obtaining outside financing and required that they forfeit a $10,000 deposit if such financing was not obtained. They found a bank that agreed to process their loan application, but the bank ultimately determined that they qualified for an amount considerably less than needed to complete the sale. The plaintiffs protested this determination to no avail. Thereafter, they applied for a loan from another lender, but during the time their initial application was being processed interest rates skyrocketed, making the loan for which they were subsequently approved by the second bank significantly more expensive. Thus, the plaintiffs in *Jacques* faced the Hobson's choice of either accepting the first bank's financing offer – which, they contended, was low due to negligence in processing their application – or forfeiting their $10,000 deposit.

Under these circumstances, the Court of Appeals found that the bank owed the plaintiffs a duty of care. The court based

16

its decision, first, upon finding that the bank made "at least two express promises to the Jacques." *Jacques*, 307 Md. at 537. "It agreed first to process their loan application and second to 'lock in' the interest rate . . . for a period of ninety days." *Id*. Upon further finding that these promises were supported by consideration – namely, the Jacques' payment of an application fee and the potential business advantage to the bank – the court turned to "the final consideration of whether a concomitant tort duty should be recognized under these circumstances." *Id*. at 540. The court noted that the case presented "extraordinary financing provisions" that "left the Jacques particularly vulnerable and dependent upon the Bank's exercise of due care." *Id*. Observing that "the Bank had knowledge that the Jacques would be legally obligated to either proceed to settlement with the loan determined by the Bank or forfeit their deposit of $10,000.00 and lose any benefit of their bargain," the court found that the bank "undertook a significant responsibility" in agreeing to process the loan application. *Id*. at 540-41. Considering also the "public nature" of the bank and that the "banking business is affected with the public interest," the court held that "[t]he recognition of a tort duty of reasonable care" was "consistent with the policy of this State" and "reasonable in light of the nature of the banking industry and its relation to the public welfare." *Id*. at 543.

In so ruling, however, the court emphasized the extraordinary circumstances presented:

> The case before us is factually distinguishable from those in which a prospective customer simply submits an application for a loan, or for insurance, and thereafter claims that the unilateral act of submitting the application gives rise to a duty on the part of the recipient to act upon it without delay. The courts have generally held in those instances that the bank or insurance company has not undertaken to process the application, and therefore has no duty to do promptly that which it has no duty to do at all.

*Id.* at 538-39.

Plaintiffs contend that, like the plaintiffs in Jacques, they had a contractual relationship with Defendant; that they were particularly vulnerable; and that they risked the loss of their home if Defendant did not process their request for loan modification in a reasonable manner. The contractual relationship cited by Plaintiffs, however, is the underlying mortgage, and there are no allegations of negligence arising from that contract. Rather, Plaintiffs' allegations relate to Defendant's negligent processing, or failure to process, their request for loan modification, which was an entirely different transaction. *See Neal*, 2013 WL 428675, at *6 ("Although it is true the Neals had contractual privity with RCS by virtue of their original mortgage, that does not govern whether RCS owed the Neals a duty of care in the processing of their loan

modification application.").[6]   In *Jacques*, the alleged negligence was based upon the court finding a valid and enforceable contract with respect to the loan application.   The same facts are not presented here.   Moreover, in *Jacques*, the bank knew at the time it agreed to process the plaintiffs' application that the Jacques would likely be obligated either to accept the proposed amount or forfeit their deposit.   Here, Plaintiffs' home was in foreclosure at the time they submitted documents in support of their modification request.   Thus, Plaintiffs were threatened with the loss of their home prior to any alleged negligence by Defendant; in *Jacques*, the plaintiffs were placed at risk because of the bank's negligence.   While it is likely true that Plaintiffs were vulnerable due to the pending foreclosure action, that vulnerability related to factors independent of their request for loan modification.

---

[6] In *Neal*, 2013 WL 428675, at *5, the court denied summary judgment as to the plaintiffs' negligent misrepresentation claim upon finding that, based upon the existing mortgage, the defendant "had a duty to provide truthful information to Plaintiffs to maintain their mortgage in good standing; thus, it was inconsistent with that duty to advise Plaintiffs to miss mortgage payments to be eligible for loan modification."   The negligence claim, however, was based on an alleged duty of care with regard to a loan modification application.   Based on *Jacques*, the court found that no such duty existed.   Here, Plaintiffs point to the underlying mortgage as evidence that the parties are in contractual privity, but they do not identify any specific duty owed pursuant that contract.   To the contrary, their negligence and negligent misrepresentation claims both arise in connection with their loan modification request.

In sum, the communications cited by Plaintiffs did not create an enforceable contract with Defendant, nor was there otherwise a nexus between the parties sufficient to impose a tort duty on Wells Fargo. *See Goss*, 2013 WL 105326, at *5; *Spaulding*, 2012 WL 3025116, at *6. Because Plaintiffs' negligence and negligent misrepresentation claims are dependent on the existence of a duty, *see Parker*, 91 Md.App. at 367 ("In order to state a cause of action [for] . . . negligent misrepresentation [and] negligence . . . the [plaintiffs] must demonstrate a duty owed to them by [the defendant]"), these claims cannot be sustained. Accordingly, they will be dismissed.

### B.   The Maryland Consumer Protection Act, Fraud, and Promissory Estoppel

Plaintiffs further assert claims under the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law §§ 13-101 *et seq*., for common law fraud, and for promissory estoppel.[7]

---

[7] The MCPA proscribes enumerated "deceptive trade practices," including "[f]alse . . . or misleading oral or written statement[s]" and any "[v]iolation of a provision of . . . Title 14, Subtitle 2 of this article, the Maryland Consumer Debt Collection Act ["MCDCA"][.]" Md. Code Ann., Com. Law §§ 13-301(1) and (14)(iii). In addition to alleging violations based on false or misleading statements, Plaintiffs allege that Defendants' conduct constituted violations of the MCPA vis-à-vis the MCDCA.

The MCDCA "prohibits debt collectors from utilizing threatening or underhanded methods in collecting or attempting to collect a delinquent debt." *Bradshaw v. Hilco Receivables,*

In order to prevail on any of these claims, they must show that they reasonably relied to their detriment on some promise or misrepresentation made by Wells Fargo. *See Goss*, 2013 WL 105326, at *3 ("To state a claim under the MCPA, 'the consumer must have suffered an identifiable loss, measured by the amount the consumer spent or lost as a result of his or her reliance on the sellers' misrepresentation'") (quoting *Lloyd v. General Motors Corp.*, 397 Md. 108, 143 (2007)); *Hoffman v. Stamper*, 385 Md. 1, 28 (2005) ("To prove an action for civil fraud based on affirmative misrepresentation, the plaintiff must show that . . . [he or she] relied on the misrepresentation and had the right to rely on it, and . . . . suffered compensable injury as a result"); *Pavel Enters., Inc. v. A.S. Johnson Co., Inc.*, 342 Md. 143, 166 (1996) (to establish liability for detrimental reliance, the preferred nomenclature for claims of promissory estoppel in Maryland, the plaintiff must show, *inter alia*, a "clear and definite promise" by the promisor that "induce[d]

---

*LLC*, 765 F.Supp.2d 719, 731-32 (D.Md. 2011) (citing Md. Code Ann., Com. Law § 14-202). More specifically, it proscribes certain conduct in the collection of a debt, such as the use or threat of force or criminal prosecution, disclosure or threat of disclosure to third parties, communication at unusual hours or with unreasonable frequency, use of abusive language, claiming or threatening to enforce non-existent rights, or use of communications giving the appearance of judicial or governmental authority. Plaintiffs have not alleged any such conduct by Wells Fargo, nor does the MCDCA otherwise appear to have any application.

actual and reasonable action or forbearance by the promisee" and "cause[d] a detriment which can only be avoided by the enforcement of the promise.").[8]

Wells Fargo contends that it made no material misrepresentations or clear and definite promises to Plaintiffs

---

[8] Citing the text of the MCPA, Plaintiffs assert they are not required "to allege justifiable reliance," and that "a plaintiff need only allege a '[f]alse . . . or misleading oral or written statement . . . which has the capacity . . . of deceiving or misleading consumers[.]'" (ECF No. 27-1 (quoting Com. Law § 13-301(1)). The mere existence of a violation, however, does not necessarily lead to private relief, and Plaintiffs ignore the "clear distinction between the elements necessary to maintain a public enforcement proceeding versus a private enforcement proceeding." *CitaraManis v. Hallowell*, 328 Md. 142, 152 (1992). A party who files a complaint with the Attorney General need not establish reliance leading to actual injury. *See Lloyd*, 397 Md. at 142. On the other hand, a private party who brings a suit must establish that he or she has "suffered an identifiable loss, measured by the amount the consumer spent or lost as a result of his or her reliance on the sellers' misrepresentation." *Id.* at 143. Thus, Plaintiffs "must establish actual injury or loss, despite the language in § 13-302 [*i.e.*, that "[a]ny practice prohibited by this title is a violation . . . whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice."]" *Morris v. Osmose Wood Preserving*, 340 Md. 519, 538 n. 10 (1995); *see also Bank of America v. Jill P. Mitchell Living Trust*, 822 F.Supp.2d 505, 532 (D.Md. 2011) ("Consumers must prove that they relied on the misrepresentation in question to prevail on a damages action under the MCPA" and "[a] consumer relies on a misrepresentation when the misrepresentation substantially induces the consumer's choice."); *Farwell v. Story*, Civ. No. DKC 10-1274, 2010 WL 4963008, at *8-9 (D.Md. Dec. 1, 2010) (dismissing MCPA claim where plaintiff failed to allege reliance); *Willis v. Countrywide Home Loans Servicing*, Civ. No. CCB 09-1455, 2009 WL 5206475 (D.Md. Dec. 23, 2009) (dismissing MCPA claim where plaintiff failed to allege that "Countrywide's misinformation regarding loan modification programs caused [plaintiff] to suffer any specific harm, apart from the debt that he already owed")).

in connection with their loan modification request, and that even assuming it did, Plaintiffs cannot show that they reasonably relied on such misrepresentations or promises to their detriment.   In arguing otherwise, Plaintiffs maintain that, in reliance on Defendant's representations, they "did not challenge foreclosure proceedings from the date they were filed, May 16, 2011, until March 2, 2012."   (ECF No. 27-1, at 14). They further point to the amended complaint, which recites that they "justifiably relied to their detriment on the false representations by defendant, by taking time out of their lives to submit and re-submit documentation[.]"   (*Id.*).

In support of their argument, Plaintiffs rely heavily on *Allen v. CitiMortgage*, No. CCB-10-2740, 2011 WL 3425665 (D.Md. Aug. 4, 2011).   That case involved plaintiffs who alleged that they had been approved for a TPP under HAMP; began making payments in accordance with the TPP; subsequently received a number of confusing and contradictory communications from the servicer, advising them, *inter alia*, not to remit payments; and, as a result of their reliance, they were terminated from the loan modification program and received negative credit reports. Under those circumstances, the court found a plausible claim for promissory estoppel:

> The plaintiffs allege that CitiMortgage made
> a clear and definite promise that "if they
> made their temporary loan modification

> payments [and] met the criteria for a HAMP
> modification, then they would receive a
> permanent HAMP modification, and that
> Defendant would not report Plaintiffs as
> delinquent as long as they were in
> compliance with making the agreed-upon
> payments." The Allens also allege that they
> detrimentally relied on CitiMortgage's
> promises by relinquishing other remedies to
> save their home, such as restructuring their
> debt under the bankruptcy code, and by
> devoting their resources to making the lower
> monthly payments under the TPP Agreement. If
> they had known that they would not qualify
> for a permanent loan modification or that
> CitiMortgage would report them as delinquent
> to credit reporting agencies for making
> lower monthly payments under the TPP, the
> plaintiffs allege they would have pursued
> other options, including possibly selling
> their home.

*Allen*, 2011 WL 3425665, at *8 (internal citation omitted).  The

court also found that an MCPA claim survived the dismissal

motion because the plaintiffs "alleged that CitiMortgage's

misleading letters led to the following damages: damage to Mrs.

Allen's credit score, emotional damages, and forgone alternative

remedies to save their home."  *Id.* at *10.  Thus, the court

determined, the plaintiffs "stated sufficiently an actual injury

or loss as a result of a prohibited practice under the MCPA."

*Id.*

      Unlike the plaintiffs in *Allen*, the instant plaintiffs have

not made a sufficient showing of damages resulting from their

reliance on Defendant's promises or misrepresentations.  While

they argue in their motion papers that Defendant's

misrepresentations caused them to forego unspecified action in the foreclosure proceeding from May 16, 2011 – the date the foreclosure action was filed – until March 2, 2012 – the date they filed a motion to stay – no such allegation appears in the amended complaint.  Rather, their pleading merely recites that Defendant's misrepresentations "*could* cause a reasonable consumer to . . . be [led] into a false state of comfort and thereby not assert foreclosure objections[.]"  (ECF No. 24 ¶ 37.4 (emphasis in original)).  A footnote in the same paragraph of the complaint suggests that Plaintiffs relied on the language of Md. Code Ann., Com. Law § 13-302, which provides that "[a]ny practice prohibited by this title is a violation . . . whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice."  (*Id.* at 15 n. 3).  As noted, however, a private party bringing an action under the MCPA must show that he or she has "suffered an identifiable loss, measured by the amount the consumer spent or lost as a result of his or her reliance on the [] misrepresentation." *Lloyd*, 397 Md. at 143.  So, too, is reasonable reliance necessary to establish liability for fraud and promissory estoppel.

While Plaintiffs assert that they were lulled into a "false state of comfort" by Defendant's representations, they do not allege, as did the plaintiffs in *Allen*, that Defendant

specifically directed them to do, or to refrain from doing, anything that adversely affected the state of affairs that existed prior to the alleged misrepresentations. Indeed, the written communications from Defendant during this time period made clear that "any collection and foreclosure action" would "continue uninterrupted until approval" of a loan modification. (ECF No. 24-4, at 2; see also ECF No. 24-7, at 3 ("understand that if your mortgage has been referred to foreclosure, that process moves forward at the same time [as efforts to avoid a foreclosure sale]"); ECF No. 24-9, at 2 ("Because you are currently in the foreclosure process, you have limited time to receive assistance before a foreclosure sale is scheduled"). Despite these warnings, Plaintiffs suggest that they refrained from raising objections in the foreclosure proceeding. To the extent that they did so in reliance on Defendant's alleged "promise" to process their loan modification request, that reliance was not reasonable.

Plaintiffs further assert that "taking time out of their lives to submit and re-submit documentation" constitutes detrimental reliance (ECF No. 27-1, at 14), but they do not allege that this resulted in compensable loss, such as lost wages due to time away from work, and, as Defendant observes, much of this time would have been necessary "even if their loan was ultimately modified" (ECF No. 23-1, at 13). Moreover, the

complaint recites that "[a]s a direct and proximate result of
Wells Fargo's conduct, the Greens['] credit scores were lowered,
because Wells Fargo reported the mortgage negatively to consumer
reporting agencies, constituting economic damages." (ECF No. 24
¶ 30). Their claim in this regard is that if Defendant would
have processed their application properly, Plaintiffs "would
have been issued a loan modification, causing Wells Fargo to
report the mortgage positively." (*Id.*). In other words, the
alleged "lowered" credit scores resulted from the fact that
Plaintiffs were not making the required payments under their
existing mortgage; they were not caused by any misrepresentation
made by Wells Fargo. Plaintiffs also allege that they suffered
"mental anguish," manifested by physical symptoms, and a number
of courts have found such allegations sufficient to support
liability under the MCPA. *See Piotrowski v. Wells Fargo*, Civ.
No. DKC 11-3758, 2013 WL 247549, at *12 (D.Md. Jan. 22, 2013);
*Marchese v. JPMorgan Chase Bank*, --- F.Supp.2d ----, 2013 WL
136427, at *12 (D.Md. Jan. 8, 2013); *Allen*, 2011 WL 3425665, at
*10. Under the facts presented in the amended complaint,
however, the absence of any clear reliance by Plaintiffs on
Defendant's misrepresentations makes the causal connection
between any misconduct and these symptoms too tenuous.[9]

---

[9] In *Piotrowski*, 2013 WL 247549, at *1-2, by contrast, the
plaintiff applied for a loan modification promptly after default

Because Plaintiffs have failed to show that they relied on Defendant's alleged misrepresentations to their detriment, their claims under the MCPA, for common law fraud, and for promissory estoppel will be dismissed.

---

and the servicer approved a "Special Forbearance Agreement" that allowed the plaintiff to pay a reduced mortgage payment while the application was being processed. In reliance on that agreement, the plaintiff made the reduced payments in advance of the due date, but was later informed that his loan was "in default for failure to make payments due." After curing the default, the plaintiff submitted another loan modification application, and was forced to pay "late fees" arising "as a result of the Special Forbearance Agreement." *Id.* at *3. When, despite his diligent efforts, no decision was made on his loan modification application, the plaintiff filed suit, alleging that:

> [A]s a result of Wells Fargo's alleged "direct and indirect actions," including "through the improper threat of an imminent foreclosure action against the Property" and "the assessment of unfair and deceptive late fees and costs to his accounts," he has (1) suffered damage to his credit; (2) incurred legal fees and expenses; (3) lost time from work in attempting to resolve the dispute without litigation; and (4) suffered emotional damages "manifested by severe insomnia, sleeplessness, worry, and an[x]iety."

*Id.*

Under those facts, the emotional distress and other damages were plausibly related to the plaintiff's reliance on Wells Fargo processing the application for loan modification, as foreclosure was imminent due largely to Wells Fargo's alleged misconduct. Here, Plaintiffs waited months after their initial default to contact Wells Fargo regarding a modification; they failed to respond in a timely manner to Wells Fargo's request for documentation; and they did not submit their documentation until after the foreclosure action had already commenced.

Although Plaintiffs have not requested leave to amend in the event that the motion to dismiss were granted, courts are to grant leave "freely . . . when justice so requires." Fed.R.Civ.P. 15(a). Leave to amend should be denied, however, where "the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *HCMF Corp. v. Allen*, 238 F.3d 273, 276 (2001) (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986)). "An amendment is futile when the proposed amendment is clearly insufficient on its face, or if the amended claim would still fail to survive a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6)." *El-Amin v. Blom*, Civ. No. CCB-11-3424, 2012 WL 2604213, at *11 (D.Md. July 5, 2012).

Based on the facts presented, Plaintiffs will not be permitted to amend their complaint with respect to their claims of negligence, negligent misrepresentation, or promissory estoppel. The absence of a cognizable tort duty owed by Wells Fargo renders any claim based in negligence futile. Moreover, the state court docket reflects that a hearing on Plaintiffs' exceptions to the foreclosure sale is currently scheduled for March 21, 2013. Insofar as Plaintiffs seek specific performance in connection with their promissory estoppel claim, the circuit court is best situated to determine whether such relief is warranted, and the decision on Plaintiffs' exceptions could

potentially render moot any amendment of their promissory estoppel claim.[10]   Leave will be granted, however, as to Plaintiffs' MCPA claim based on false or misleading oral or written statements, as well as its claim for common law fraud. Taken as a whole, the cited communications by Wells Fargo may be viewed as having "the capacity . . . of deceiving or misleading consumers," Md. Code Ann., Com. Law § 13-301(1), and if Plaintiffs can show that they suffered damages as a result of their reasonable reliance on the alleged misrepresentations, they could assert plausible claims for relief.   Accordingly,

---

[10] In *Bates v. Cohn*, 417 Md. 309, 327 (2010), the Court of Appeals of Maryland clarified that, "after a foreclosure sale 'the debtor's later filing of exceptions . . . may challenge only procedural irregularities at the sale or . . . the statement of indebtedness.'"   (Quoting *Greenbriar Condo. v. Brooks*, 387 Md. 683, 688 (2005)).   However, the court expressly left open the question of:

> [W]hether a homeowner/borrower may assert under [Md. Rule] 14-305, as a post-sale exception, claims that a foreclosure sale was the product of the lender affirmatively and purposefully misleading the borrower in default that ultimately unsuccessful pre-sale loss mitigation or loan modification efforts would likely be successful (or protracting strategically the denial of those efforts) and therefore dissuading the borrower from seeking to assert pre-sale defenses in a timely manner.

*Bates*, 417 Md. at 328.   Insofar as Plaintiffs seek to avoid ratification of the foreclosure sale, as opposed to an award of monetary damages resulting from the alleged misrepresentations, principles of comity militate strongly in favor of their argument being addressed in state court.

they will be permitted fourteen days in which to file an amended complaint raising these specific claims.

**IV.  Conclusion**

For the foregoing reasons, Defendant's motion to dismiss will be granted without prejudice to Plaintiffs' right to file an amended complaint asserting specified claims within fourteen days.  A separate order will follow.

                    _____/s/_____
                    DEBORAH K. CHASANOW
                    United States District Judge